

FILED
May 12, 2021
12:30 PM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

**TENNESSEE BUREAU OF WORKERS' COMPENSATION**
**WORKERS' COMPENSATION APPEALS BOARD**

| | |
|---|---|
| Sheila D. Owens | ) Docket No. 2015-01-0401 |
| | ) |
| v. | ) State File No. 44323-2015 |
| | ) |
| Sitters, Etc., et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) |
| Compensation Claims | ) |
| Audrey A. Headrick, Judge | ) |

---

**Affirmed and Remanded**

---

This is the third interlocutory appeal in this case. The employee, a home health aide, sustained work-related injuries when she caught a falling patient, which resulted in shoulder, neck, and low back pain. The employer accepted the shoulder and low back injuries as compensable but denied that any compensable aggravation of the employee's pre-existing cervical condition arose primarily out of the work incident. Following the first expedited hearing, the trial court ordered the employer to provide medical benefits for the employee's cervical condition. The employer appealed, and we reversed the trial court's order, concluding the expert medical proof did not support the court's determination that the employee was likely to prove a compensable aggravation of her pre-existing condition. In the second expedited hearing, the parties submitted the same depositions and medical records as were previously considered by the trial court with the addition of lay witness testimony and an affidavit from the court reporter correcting a typographical error in one of the medical depositions. The trial court again ordered additional treatment for the employee's cervical condition. The employer appealed, and we affirmed the trial court's order. Thereafter, the employer provided a panel of orthopedists for evaluation and treatment of the employee's neck complaints. After receiving a causation opinion from the authorized physician, the employer requested a third expedited hearing. In a decision on the record, the trial court concluded the employee was not likely to establish that the work incident primarily caused her *current* need for medical treatment. The employee has appealed. We affirm the trial court's order and remand the case.

Judge Pele I. Godkin delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner and Judge David F. Hensley joined.

Ronald J. Berke, Chattanooga, Tennessee, for the employee-appellant, Sheila D. Owens

1

Alex B. Morrison, Knoxville, Tennessee, for the employer-appellee, Sitters, Etc.

## Factual and Procedural Background

This is the third interlocutory appeal in this case. Sheila D. Owens ("Employee") was employed as a nursing assistant by Sitters, Etc. ("Employer"). Employee alleged that on June 9, 2015, she suffered work-related injuries to her shoulder, back, and neck when she attempted to prevent an elderly patient from falling. Employee was provided authorized medical treatment with Dr. Rickey Hutcheson for her back complaints and Dr. Robert Mastey for her shoulder complaints.[1]

Dr. Mastey first saw Employee for her work-related shoulder injury in August 2015. At that time, he noted he had seen her previously for "severe neck pain and bilateral hand numbness." He opined that her "shoulder problem is more than 51 percent related to the [work] injury" but declined to offer a causation opinion regarding her neck condition because he "wasn't treating her for her neck."

On March 1, 2016, Employee saw Dr. Alexander Roberts, a physical medicine and rehabilitation physician, upon referral from her primary care physician for complaints of cervical spine and bilateral upper extremity pain with numbness and tingling. The report detailed Employee's prior treatments for her cervical spine, beginning in 2000 with surgeries in 2002, 2004, and 2008, physical therapy in 2012, and a CT scan in 2013. Dr. Roberts ordered cervical CT and MRI studies and bilateral upper extremity EMG and nerve conduction studies.

The cervical CT scan indicated degenerative disc disease at the C3-4 and C5-6 levels, anterior cervical fusion from C5-7 without vertebral screws in the C6 vertebrae, evidence of a fragment of a screw in the C6 vertebrae, and evidence of a fusion at C4-5 with a solid arthrodesis. The MRI revealed degenerative disc disease at the C3-4 and C5-6 levels, a disc bulge with an overlapping central disc protrusion at C3-4, and right and left stenosis at C3-4, C5-6, and C7-T1. The EMG and nerve conduction study revealed "electrodiagnostic evidence of a right C5 and C6 radiculopathy with active denervation." Based upon these findings, Dr. Roberts referred Employee to Dr. Richard Pearce for a surgical evaluation.

Dr. Pearce first examined Employee on July 14, 2016, and, after reviewing the diagnostic studies, recommended surgery. Approximately one year later at Employee's next visit with Dr. Pearce, he noted she was "still trying to get [workers' compensation's] approval for surgery but having increased [numbness and tingling]." Employee's attorney sent a letter to Dr. Pearce asking whether the need for the cervical surgery he had

---

[1] Employee has been placed at maximum medical improvement with respect to the back injury, and that injury is not at issue in this appeal.

2

recommended in July 2016 was (1) "[c]aused by the new injury," (2) "[c]aused by the old condition being aggravated by the new injury," or (3) "[c]aused by the old injury." Dr. Pearce marked "yes" to the second question but did not indicate a response to the first or third questions.[2]

In his deposition, Dr. Pearce testified that, based on his comparison of the 2013 and 2016 CT scans, the 2016 CT scan showed that the condition of Employee's spine at C3-4 was worse than it had been in 2013. Asked if he had an opinion whether the "condition at C3-4 was caused by her work-related injury in June 2015," he said only that he would "relate it" to that particular event. When asked whether Employee's June 2015 injury made her anatomical findings worse, he answered, "[b]ased on the CTs, the area at C3-4 appeared to be worse."

On cross-examination, Dr. Pearce agreed that diagnostic studies prior to the June 2015 work incident showed anatomic changes in Employee's cervical spine. He said the only pre-injury diagnostic report he had was the CT scan performed in 2013. He was then shown and questioned about an MRI report from 2003, two MRI reports from 2007, two MRI reports from 2008, and an MRI report from 2013. He agreed the reports of the 2003 MRI and a March 2007 MRI did not show significant abnormalities, and that a report of an August 2007 MRI indicated a small disc protrusion at C3-4 without spinal cord deformity, which represented an anatomic change from the earlier MRI reports. He agreed that a 2012 MRI report described a disc herniation at C3-4 that was "touching" the spinal cord. When asked whether, having considered the diagnostic reports that pre-dated the June 2015 incident, it was still his opinion that Employee's C3-4 problems were "related" to the June 2015 injury as opposed to a natural progression of the condition at C3-4 since 2007, Dr. Pearce responded:

> Based on the reports that you have, there [were] obviously some early anatomic changes, some maybe degenerative changes, some bulging of the discs. Based on the MRI that I reviewed in 2016, the amount of cord compression and the size of that disc herniation [were] obviously much worse. And at what point that occurred between the last MRI of 2012 versus 2016 I cannot say except, based on her history, that she started having symptoms, and now we have a new MRI which shows a definite anatomic change.

---

[2] Dr. Mastey, Employee's authorized physician for her shoulder, was also asked whether he thought the neck complaints were related to the June 2015 work incident. He testified they "could very well be, but . . . this neck is such a bad problem it doesn't take much to trigger it off. I would have to defer that to Dr. Pearce." Dr. Mastey placed Employee at maximum medical improvement for her shoulder condition in December 2017, although he indicated that might change if she had a later shoulder surgery. He explained that whether she had that surgery would, to some extent, depend on the course of treatment for her neck. Employee's shoulder injury is not at issue in this appeal.

3

Dr. Pearce acknowledged that Employee's disc at C3-4 could have continued to "worsen without pain symptoms." He admitted he could not say that the "worsening" occurred on or after the June 2015 incident, but "based on [Employee's] history when the symptoms got worse . . . I have to assume that's when that occurred."

In December 2016, Employer sought an independent medical evaluation with Dr. Jay E. Jolley, an orthopedic surgeon. Dr. Jolley noted Employee had undergone three cervical spine surgeries. He attributed the condition of Employee's cervical spine to degeneration not caused by the 2015 work injury. Dr. Jolley testified that the surgery Dr. Pearce recommended was a reasonable option for Employee but stated he did not "see how that would be related directly to the incident of 2015." He testified his assessment was that Employee's "pains in her right arm were due to the stenosis at C3-C4 . . . which would typically be from bone spurs and essentially arthritis." He added that "the cervical issues appear to be chronic and pre-existing." When questioned whether he agreed with Dr. Pearce's responses to the causation questionnaire, he responded in the affirmative.

In lieu of convening an evidentiary hearing, the trial court issued a decision on the record in which it concluded Dr. Jolley and Dr. Pearce agreed that Employee's neck complaints resulted from her work injury. The court ordered Employer to provide a panel of orthopedic surgeons for treatment of Employee's cervical injury. Employer appealed, and we reversed the trial court, finding that Dr. Pearce's use of the word "proximally" in addressing causation was insufficient to satisfy Employee's burden of proof. Additionally, we disagreed with the trial court's characterization of Dr. Jolley's opinion as "agree[ing] with Dr. Pearce's opinion." *See Owens v. Sitters, Etc.*, No. 2017-01-0401, 2018 TN Wrk. Comp. App. Bd. LEXIS 26, at *1-12 (Tenn. Workers' Comp. App. Bd. May 29, 2018).

Employee subsequently sought clarification from the court reporter regarding the use of the word "proximally" as it appeared in Dr. Pearce's deposition transcript. The court reporter submitted an affidavit attesting to the fact that the transcript should have reflected that the question asked of Dr. Pearce was whether the work accident was the *proximate* cause of Employee's cervical complaints. Following Employee's second request for an expedited hearing, the court convened an evidentiary hearing at which Employee and four lay witnesses testified. In particular, Employee testified as to the effect that her injuries had on her activities and abilities. The trial court found Employee to be a credible witness, found that Dr. Pearce offered the more convincing testimony concerning causation, and concluded that, when considering the expert medical proof in conjunction with the lay testimony, Employee had presented sufficient evidence to establish she would likely prevail at trial on the issue of causation. Employer appealed, and we affirmed the trial court's order. *See Owens v. Sitters, Etc.*, No. 2017-01-0401, 2019 TN Wrk. Comp. App. Bd. LEXIS 27, at *2-16 (Tenn. Workers' Comp. App. Bd. June 28, 2019).

While the second appeal was pending, Dr. Pearce performed a C3-4 anterior cervical discectomy and fusion on April 10, 2019. After our June 2019 decision affirming the trial

court's order was issued, Employer provided a panel of orthopedists for Employee's cervical condition from which Employee selected Dr. Alex Sielatycki. Employee first saw Dr. Sielatycki on March 12, 2020, and his report of that visit noted the evaluation was for a "2nd opinion to answer questions regarding whether [Employee's] current cervical issues are related to a reported work accident in 06/2015." Dr. Sielatycki reported Employee had "pain at the base of the neck, pain with range of motion, and some pain and numbness in the bilateral hands." He noted Employee's C3-4 level was "taken care of and fused solidly," and he "[did] not believe either of these levels are causing any problems." Dr. Sielatycki reported Employee's "ongoing neck pain is likely related to pseudoarthrosis at C5-7[,] as well as anterolistheses of C7-T1 causing foraminal narrowing and likely causing some of her hand symptoms, especially on the left side." In attempting to address causation, his report stated:

> It is my charge to opine on whether her current claim is work-related or not. Her case is complicated. Certainly the pseudoarthrosis at C5-7 is not related to her work-related injury in 2015 as the previous cervical surgeries had been done prior to this and so her ongoing cervical pain, I believe, would be related to . . . that operation. Also, the degeneration at C7-T1 with anterolisthesis is more of an adjacent segment degeneration problem, again related to the lower fusions and not related to the 2015 incident. The C3-4 level does show a disc herniation. I do not personally have imaging available immediately prior to the alleged incident in 2015. However, I do have an MRI from 04/2012 which does show a disc protrusion at C3-4. Therefore, the condition of the disc protrusion itself being present was unlikely caused by the work-related injury. However, onset of symptoms from the C3-4 disc could have been worsened and exacerbated by the work injury . . . . I believe the pain in the neck from the pseudoarthrosis at C5-7 as well as the anterolisthesis at C7-T1 is unrelated to the 2015 incident. I did review the MRI from 2012 and it does have a disc herniation at C3-4 which predates her alleged 2015 incident. Therefore, I cannot conclude that the disc herniation happened de novo in 06/2015. I cannot state definitely that her symptoms from the C3-4 disc herniation did not start or worsen as a result of the 2015 incident as this is a subjective report from the patient.

Dr. Sielatycki also provided written responses to a medical questionnaire sent by Employer and agreed that Employee's post-accident cervical issues were more than fifty percent related to her preexisting injuries, explaining that her "current ongoing pain likely [was] related to pseudoarthrosis [at] C5-7, and adjacent segment disease [at] C7-T1." He also agreed that post-accident MRIs and CT findings were primarily the result of cervical conditions preexisting the June 2015 work incident, clarifying that Employee's "disc herniation C3-4 was present on [her] 2012 MRI." When questioned as to whether Employee's "April 2019 cervical surgery was primarily (more than 50%) the result of cervical conditions pre-existing her June 9, 2015 work injury," Dr. Sielatycki marked "no,"

5

explaining "[t]he [d]isc herniation was present prior to the 2015 incident. However[,] treatment is based on symptoms, not MRI alone, thus, [the] onset of symptoms of myelopathy would cause [the] need for C3-4 ACDF. Report of when those symptoms arose is subjective." Dr. Sielatycki agreed that Employee's ongoing neck pain was "more likely related to" her preexisting conditions and did not believe she sustained "any permanent cervical injury that is more than 50% related to her June 9, 2015 work accident."

Dr. Sielatycki was subsequently deposed. During the deposition, he was asked whether Employee's "post[-]accident cervical issues are more than fifty percent related to her preexisting injury[.]" In response, he testified:

> I believe that her current symptoms, as of when I saw her on March 12th, her ongoing neck pain, hand numbness, [are] more related to her previous surgeries from the 2012 incident. So the previous [fusion] that she had, it looks like on her imaging, did not heal completely. So her ongoing symptoms are, I believe, more likely related to that 2012 incident.

Dr. Sielatycki clarified that the symptoms he was referring to were related to Employee's pseudoarthrosis and the spondylolisthesis at C7-T1. He testified that "the term 'pseudoarthritis' . . . means failure of fusion. So [Employee] had an operation that was intended to fuse those vertebrae together, and it does not appear[] that [the fusion] healed well . . . to the date that I saw her – her ongoing neck symptoms were related to that diagnosis, the pseudoarthrosis and the spondylolistheses at C7-T1."

Dr. Sielatycki acknowledged that he did not review Employee's 2013 CT or EMG. When asked if Employee's C3-4 injury was caused by the 2015 incident, considering the history provided by Employee, Dr. Sielatycki testified, "Yes. I think relying on the patient's history as to when her symptoms began is what I would have to do there." In reviewing Employee's 2012 MRI, Dr. Sielatycki confirmed the imaging revealed

> some compression on the spinal cord at C3-4 . . . [but] I cannot make the determination as to whether [Employee] had symptoms from that at the time and . . . having not met her . . . I can also show that the spinal-cord compression on the MRI in 2016 appears to be worsened somewhat. So it was present in 2012, worse in 2016; and I cannot comment on her symptoms related to that.

When asked if this was compatible with Employee's history of an injury in 2015 that caused her condition to worsen, Dr. Sielatycki testified that "if [Employee] reported no symptoms prior to the incident in 2015 and then had onset of spinal-cord compression at that time, with subsequent imaging showing that, that would be compatible." When questioned whether the 2015 work incident aggravated her preexisting condition and caused anatomic changes to C3-4, Dr. Sielatycki responded:

I cannot confirm it caused anatomic changes; but it caused symptoms, according to her history. The only . . . way to confirm anatomic changes without question would have been an MRI immediately previously, prior, to the injury in question and an MRI immediately following, which we don't have, so we have to rely on the patient's history.

Dr. Sielatycki also testified that the MRI from March 2016 showed the disc herniation at C3-4 was larger than it had been previously, which he stated would be "some objective evidence that there was worsening that occurred between 2012 and 2016." He expounded further, stating that "[i]f the disc herniation [was] perhaps calcified or more chronic-appearing, that would be evidence that it maybe was not an acute traumatic event. In [Employee's] case, it does have the appearance of a soft disc herniation, which does typically suggest a more recent onset and a more acute event." He agreed that his testimony "supports the opinion that trauma produced this aggravation of her preexisting injury."

Employer filed a Motion to Terminate Medical Benefits on March 31, 2020, and in a decision on the record, the trial court noted that, as the authorized treating physician, Dr. Sielatycki's causation "opinion is presumed correct subject to rebuttal by a preponderance of the evidence." *See* Tenn. Code Ann. § 50-6-102(14)(E). In its order, the trial court "relieved [Employer] of the requirement to provide medical treatment for [Employee's] cervical complaints imposed by the Court's January 25, 2019 [o]rder" and concluded

Dr. Sielatycki's contradictory causation opinions, made without the benefit of all prior diagnostic tests, standing alone, are not sufficient to alter the Court's previous finding that the injury to the C3-4 level of her spine *was* caused by the 2015 injury. However, the totality of the evidence reveals that Dr. Sielatycki did not deviate from his opinion that [Employee's] current symptoms arise from an older work injury rather than the 2015 injury. When considering that unrebutted opinion, the Court holds that [Employee] would likely not show that her 2015 injury primarily caused her current need for treatment at a hearing on the merits."

Employee has appealed.

**Standard of Review**

The standard we apply in reviewing the trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2020). However, a trial court's findings based upon documentary evidence is reviewed do novo with no presumption of correctness. *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with

7

basic principles of statutory construction" and in a way that does not favor either the employee or the employer.  Tenn. Code Ann. § 50-6-116 (2020).

## Analysis

Employee asserts a single issue on appeal: "whether [Employer] is responsible for current and future medical treatment for [Employee] related to her 2015 on the job injury." In her brief on appeal, Employee contends that "the question in this case involves causation at the C3-4 level" and asserts "Dr. Sielatycki stated that he would agree that [Employee's] C3-4 condition was caused by the 2015 incident."  Employer argues the trial court was "correct in its ruling that medical benefits for the alleged cervical injury were not related to the 2015 injury at issue in this matter" and relies on Dr. Sielatycki's opinion that Employee's *current* symptoms were related to a preexisting injury.  For the reasons explained below, we conclude the trial court did not err in relieving Employer "of the requirement to provide medical treatment for [Employee's] cervical complaints imposed by the Court's January 25, 2019 [o]rder."

At an expedited hearing, an employee need not prove each and every element of his or her claim by a preponderance of the evidence to obtain temporary disability benefits or medical benefits. *McCord v. Advantage Human Resourcing*, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *9 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015). Instead, an employee has the burden to come forward with sufficient evidence from which the trial court can determine that the employee is likely to prevail at a hearing on the merits consistent with Tennessee Code Annotated section 50-6-239(d)(1).  *Id.*  Thus, while an injured worker retains the burden of proof at all stages of a workers' compensation claim, a trial court can grant relief at an expedited hearing if the court is satisfied that an employee has met the burden of showing that he or she is likely to prevail at a hearing on the merits. Tenn. Code Ann. § 50-6-239(d)(1).

Following a work injury, an employer must provide reasonable and necessary medical treatment causally related to the work accident.  Tenn. Code Ann. § 50-6-204(a)(1)(A) (2020).  The opinion of a panel-selected authorized physician regarding causation is presumed correct but can be rebutted by a preponderance of the evidence. Tenn. Code Ann. § 50-6-102(14)(E) (2020).

As discussed above, following our prior decision affirming the trial court's January 25, 2019 order, Employer provided a panel of orthopedic physicians from which Employee selected Dr. Sielatycki, who she saw on one occasion.  During that visit, Dr. Sielatycki addressed Employee's *current symptoms* and determined they were "related to the 2012 incident."  Similarly, in his deposition, Dr. Sielatycki testified that Employee's complaints were related to the pseudoarthrosis and spondylolisthesis at C7-T1.  However, when questioned as to the C3-4 condition, Dr. Sielatycki agreed that objective studies he

8

reviewed along with the history provided by Employee "support[] the opinion that trauma produced this aggravation of her preexisting [C3-4] injury."

When considering the record as a whole, it is clear Dr. Sielatycki was addressing only Employee's current complaints when providing his opinion regarding the cause of Employee's current need for medical care. As the treating physician, his opinion on this issue is entitled to a presumption of correctness, which Employee has not rebutted. *See* Tenn. Code Ann. § 50-6-102(14)(E). Accordingly, we affirm the trial court's determination that Employee's current complaints were not caused by her 2015 work injury and that Employer is not required to provide medical care for those complaints. However, we do not interpret the trial court's order to relieve Employer of its statutory obligation to provide reasonable and necessary medical treatment causally related to any compensable injury or compensable aggravation of a preexisting condition.

## Conclusion

For the foregoing reasons, we affirm the trial court's March 4, 2021 order and remand the case. Costs on appeal are taxed to Employee.



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| Sheila D. Owens | ) | Docket No. 2015-01-0401 |
|---|---|---|
| | ) | |
| v. | ) | State File No. 44323-2015 |
| | ) | |
| Sitters, Etc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Audrey A. Headrick, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 12th day of May, 2021.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| Ronald J. Berke<br>Margo Hixson | | | | X | ronnie@berkeattys.com<br>margo@berkeattys.com |
| Charles E. Pierce<br>Alex B. Morrison | | | | X | cepierce@mijs.com<br>abmorrison@mijs.com |
| Audrey A. Headrick, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |

Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov